SECOND DIVISION
JUNE 1, 2010

1-07-2697

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 03 CR 11399 |
| | ) | |
| ANTHONY PITCHFORD, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE CUNNINGHAM delivered the opinion of the court:

Following a 2007 jury trial in the circuit court of Cook County, the defendant, Anthony Pitchford, was convicted of the first degree murders of his girlfriend, Cathy Bradley (Bradley), and her father, Henry Woods (Woods). The defendant received a sentence of natural life in prison. On appeal, the defendant makes the following contentions: (1) he was not proven guilty beyond a reasonable doubt; (2) alternatively, he is entitled to a new trial because the prosecutor made personal comments directed at defense counsel and made improper remarks to the jury related to motive; (3) his sixth amendment right to confront and cross-examine witnesses was violated; (4) the trial court erred in refusing to make a pretrial ruling on the defendant's motion *in limine* to bar the prosecutor from introducing the defendant's prior convictions as impeachment, where the trial court had a standing policy to reserve ruling on such motions unless and until the trial was underway and the defendant testified; and (5) he was denied the effective assistance of counsel. We affirm the judgment of the circuit court of Cook County.

BACKGROUND

The pertinent evidence presented at trial was as follows. Qianesha Vallot, Bradley's adult daughter, testified that at the time of the murders, Bradley and the defendant lived together at Bradley's home at 6218 South Paulina Street in Chicago. When Vallot was unable to contact Bradley by telephone over a two-day period, she went to Bradley's home at about 3:30 p.m. on April 24, 2003. She noticed that Bradley's car was missing from its usual parking space in front of the house. When she went inside the house, she saw the body of her grandfather, Henry Woods, "hanging off the stairs." Vallot called the police, but firefighters arrived first and found Bradley's body upstairs.

A 14-year-old female neighbor who lived across the street from Bradley's house testified that on the morning of the discovery of the bodies, she saw the defendant on Bradley's front porch. She noticed that the defendant looked around and then went inside Bradley's house.

Chicago police detective Riley James and two other Chicago police detectives responded to the scene. Detective James testified that the front door showed no sign of forced entry. He observed that Woods had gunshot wounds to his head. On the second floor, in a bedroom, Detective James saw Bradley's body. She had also been shot in the head. There were bloody footprints in the bedroom and hallway.

Later that day, the defendant contacted the police from Bradley's house. Detectives John Halloran and John Murray met the defendant at the house and he agreed to accompany them to the police station, where he was placed in an interrogation room and advised of his Miranda rights. The defendant told the detectives that a drug dealer named Jerry, to whom he owed $1,500, came to

2

Bradley's house on April 23, 2003, which was the day of the murders. According to the defendant's statement, Jerry let himself into the house. The defendant was playing with his dog on the back porch when he heard Jerry enter, but the defendant remained on the porch. He heard Jerry go upstairs and ask where the defendant was. He then heard two gunshots. The defendant claimed that he heard Jerry ask once more where the defendant was and then he heard another gunshot and the sound of a body falling. The defendant ran into the alley behind the house. He then saw Jerry driving Bradley's car, so he "hung out" at a park for several hours and then went to the home of his aunt, Patricia Pitchford (Patricia). She was not home, but the defendant stayed there several hours, then went to his mother's house. In this initial statement, the defendant claimed that he told his mother and his sister that he was going to be blamed for something bad that had happened. The defendant claimed that he went back to Patricia's house, where he spent the night.

The police questioned Patricia and her 16-year-old son, Robert Pitchford (Robert), at the police station on the day after the bodies were found. The police confronted the defendant with discrepancies between his account and those of Patricia and Robert. The defendant admitted that he had lied in his initial statement to the police. He then gave Detective Halloran another statement. According to that statement, at 9 a.m. on the morning of April 23, 2003, the defendant was sitting on the bed in the second-floor bedroom of the home which he shared with Bradley. Bradley was in the room with him. At that time Woods came to the house to fix a plumbing problem on the second floor. When Bradley went downstairs to let Woods in, the defendant took his .380-caliber semiautomatic pistol from under a pillow. Bradley returned to the bedroom and then Woods started up the stairs. The defendant fired two shots at Woods from the bedroom doorway. Woods fell to

3

the floor. The defendant next shot at Bradley, who was standing near the side of the bed. Bradley sat on the bed after the defendant fired at her, but then began to get up, at which point the defendant shot her "in the center of her head." Bradley fell to the floor and the defendant ran out of the house through the back door. He went to Patricia's house. According to this version of the defendant's account, he admitted to Patricia that he had shot both victims. He also stated that, with Patricia's help, he was able to sell his gun to a gang member. He left Patricia's house at about 9 p.m. on the day of the shootings and went to his mother's house. There, he told his mother and sister that he would have to leave town because he was going to be blamed for something that happened. He returned to Patricia's house, where he spent the night. The next day, April 24, 2003, he returned to his mother's house. He then learned that the police were looking for him.

Patricia testified for the State at trial, but her testimony was not consistent with what she had told police investigators before trial. At trial she initially testified that during the evening of April 24, 2003, the defendant came to her home. She denied talking with him but also testified that he came upstairs and spoke to her. She claimed not to recall what she learned from him about the murders. She also claimed not to recall what time the defendant left her home that night or whether she saw him the next day. Patricia stated that she took antidepressants and had been using drugs and alcohol on April 24, 2003, the night following the murders, when the police questioned her. At trial, Patricia admitted that when she spoke to Detective Tom Kelly at her home on the evening of April 24, she told him that the defendant had come to her house with a .38-caliber handgun, which he asked her to help him sell. She claimed that the defendant never told her that he killed Bradley and Woods, but she also testified that when she asked him if he had killed them he nodded his head.

4

Patricia also testified that she had reviewed and signed a handwritten statement, which she gave to an assistant State's Attorney shortly after the murders. At trial, that statement was admitted into evidence and read to the jury. In that statement Patricia said that the defendant came to her home on April 23, 2003, and asked to speak to her privately. He told her that Bradley and Woods had been shot to death. Patricia asked him if he had shot them and he initially denied it. But when she asked him again he nodded his head up and down, which she understood to mean yes. The defendant appeared to her to be nervous and his eyes were "bugging out." When she asked him why he shot the victims, he did not respond. The defendant slept at Patricia's house that night, in her son Robert's bedroom. The following morning the defendant asked her if she knew someone who would buy a gun. He showed her the gun and she told him some "guys" down the street would buy it. Patricia and the defendant walked down the street and encountered a man who agreed to buy the gun but said they should first return to Patricia's house.

According to Patricia's statement, she and the defendant returned to her house and 15 minutes later "some people" came over. The defendant met with them in the hallway and returned to tell her that he had sold the gun for five "dime" bags of cocaine and $30. Patricia noticed that the defendant was pacing the floor. She asked him if the bodies were still at Bradley's house. He responded that they were and that Bradley's daughter would be the person to find them. Assistant State's Attorney Tom Weiner, who took this statement from Patricia, testified that Patricia was responsive and alert at the time and did not appear to be under the influence of alcohol. That written statement was consistent with the oral statement that Patricia had given earlier. Detective James Riley, who accompanied Patricia to the police station, testified that she did not appear to be under

the influence of drugs or alcohol while in his company.

Patricia testified at trial that she had given testimony to a grand jury. Before testifying to the grand jury, she reviewed with Assistant State's Attorney Luann Snow the written statement which she had previously given. Snow told Patricia she should tell the truth. Patricia claimed she told Snow that she had been under the influence of drugs and alcohol when she gave the written statement. However, when Patricia testified before the grand jury she told them that she had not been under the influence of drugs or alcohol when she gave the prior written statement. In response to Patricia's trial testimony, Snow testified at trial that when Patricia appeared before the grand jury, she was clear and responsive and was willing to testify.

Patricia's grand jury testimony was admitted into evidence. It was essentially the same as the statement she gave to the police after the murders. According to her grand jury testimony, on the evening of April 23, 2003, the defendant came to her home. The next day, Chicago police officers came to her home, looking for the defendant. She spoke to the officers and then accompanied them to the police station, where she spoke to Detective Tom Kelly and Assistant State's Attorney Tom Weiner. Her statement to the police regarding what happened on April 23 and April 24, 2003, was transcribed. In her appearance before the grand jury, Patricia identified the written statement she had given to the police. In both the statement to the police and her grand jury testimony, she denied that she was threatened or promised anything to make the statement. She also denied that she was under the influence of drugs or alcohol when she made the statement to the police or when testifying to the grand jury.

At trial, Patricia verified that, as she said in the written statement to the police, the defendant

came to her house and told her that Bradley and Woods were dead. She asked him how they died and he said they were both shot in the head. When she asked him if he had done it, he moved his head up and down, which she interpreted to mean "yes."

At trial, Patricia further testified that when the police came to her home on the 24th of April she had to be awakened because she had been using cocaine and drinking. In her trial testimony Patricia insisted that she only spoke to the detectives at her home, not at the police station. But she contradicted that testimony later when she recalled that she spoke to Detective Weiner at the police station, where a written statement was taken and read to her. Patricia's trial testimony was confusing and contradictory. In her trial testimony, Patricia claimed that her attestation in her prior written statement and in her testimony before the grand jury that she was free from the effects of drugs and alcohol at the time of the statement and testimony was untrue. In her trial testimony she claimed that she said what she thought the prosecutor wanted her to say. Patricia also testified that when she was interviewed by the defendant's public defender, she told him that she had a cocaine addiction and had been to drug rehabilitation on four occasions. However, Patricia denied telling the public defender that when she asked the defendant if he had committed the murders, he just put his head down and did not answer. In fact, she reaffirmed that the defendant nodded his head in the affirmative when asked that question.

On cross-examination by defense counsel, Patricia denied she lied to the police in order to get herself out of the police station. Defense counsel then asked her if she told the police "the absolute honest to God truth." She replied "Yeah, whatever they asked me, I told them what I thought that fit the conversation." Defense counsel then asked, apparently sarcastically, "And we

know it's the truth because you're telling us it is, right?" Patricia replied "Yeah." Under continued cross-examination by defense counsel, Patricia admitted that when a public defender spoke to her at her home, he reviewed her prior written statement with her. During that interview at her home, Patricia was asked to let the public defender know if there was anything in her written statement that she was "saying now was not true." Although it was in her prior statement, Patricia testified at trial that she alerted the public defender to the falsity of that part of her statement in which she said the defendant told her that two people had been shot in the head, and that the defendant asked for her help in getting rid of the gun, which she saw in the defendant's possession. Testifying for the defense, Assistant Public Defender Gina Piemonte testified that in an interview with Patricia one year before trial, Patricia stated that the defendant did not nod his head when asked if he "did it." This was contrary to Patricia's written statement. A second assistant public defender, Lisa Brean, testified that she witnessed an interview with Patricia in defense counsel's office several months before trial. At that time, according to Brean, Patricia admitted to daily crack cocaine use "during the time involved with these proceedings" and also admitted that she had been in drug rehabilitation as recently as February 2007. Brean testified that Patricia also said that the day she gave the written statement she was high on crack cocaine and had passed out.

Patricia's son, Robert, testified that he lived with Patricia and was close to the defendant, who was his older cousin. He recalled that on the afternoon of April 23, 2003, the defendant came to his house and borrowed a pair of Nike gym shoes. The defendant left Patricia's house and returned in Bradley's car. Later that night, the defendant again returned to Patricia's house and slept in Robert's bedroom. The next morning the defendant walked to his mother's house, but Robert did

8

not recall going with him.

Robert admitted that he had given a written statement at the police station on April 24, 2003. That statement was read to the jury at trial. In the statement Robert said that he came home at 1:00 a.m. on April 24, 2003, and found the defendant lying in his bed. The defendant asked Robert for a pair of shoes, and Robert gave him the Nike gym shoes. The next morning, at the defendant's request, Robert and the defendant walked to the home of defendant's mother. Robert recalled that the defendant was acting "funny," so he asked him if something was wrong. The defendant replied that he "messed up." Later, the defendant left the house and returned with Bradley's car, which he parked one block away.

In his trial testimony, Robert disavowed some of the contents of this prior written statement. He denied that the defendant asked him to walk to the defendant's mother's house. He could not recall saying that the defendant was acting "funny." And he admitted that the defendant told him he had "messed up" but denied that this was in response to his inquiry about whether anything was wrong.

Forensic investigator Brian Smith testified at trial that he examined the murder scene on the day the bodies were discovered and found a number of shell casings and fired bullets in the house, all .38 caliber. Forensic investigator Carl Brasic processed Bradley's car, which was found parked at 6707 South Peoria, a few blocks from Patricia's home. "Newer" bloodstains were found inside the vehicle, including on the steering wheel and gearshift. Forensic DNA expert Jennifer Bell testified that samples of these bloodstains matched the defendant's DNA profile on 13 different markers. No blood consistent with that of Bradley or Woods was found in the car. A handprint

matching that of the defendant was found on the trunk of the car.

Forensic expert Robert Berk performed residue testing on the victims' bodies and detected the presence of gunshot residue on the back of Bradley's right hand and on Woods' right hand. He testified that these results indicated that the victims either fired a gun or had their right hands near where a gun was fired. That gun would have had to have been fired from within 12 feet of them in an enclosed area like a stairwell or a bedroom in order to leave gunshot residue.

The autopsy of the victims was conducted by Dr. Te An, who had retired from the medical examiner's office by the time of trial. Dr. Kendall Crowns, an assistant medical examiner, testified concerning the autopsy report prepared by Dr. An. The autopsy revealed that Bradley received three entry wounds from gunshots, with only one exit wound. One bullet struck the middle of the right side of her head, passing through her right orbital bone, her right eyeball, and her right upper eyelid. Two entrance wounds and two exit wounds from gunshots were found on Woods. One bullet entered the middle of the back of his head and exited from the right temple area. The second bullet entered the right side of Woods' face and exited from his upper left cheek. The cause of death for both victims was multiple gunshot wounds.

William Bodziak, a forensic consultant specializing in footwear impression evidence, testified for the defense that the bloody footprints found at the murder site were not made by Nike gym shoes.

Following closing arguments and instructions, the jury deliberated less than two hours before finding the defendant guilty of the first degree murders of Bradley and Woods. The trial court sentenced the defendant to a term of natural life in prison. This timely appeal was then filed.

1-07-2697

ANALYSIS

We first consider the defendant's claim that he was not proven guilty beyond a reasonable doubt. The test we apply is a familiar one: after we examine all of the evidence in the light most favorable to the prosecution, we must determine whether any rational trier of fact could find the essential elements of first degree murder beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979); People v. Collins, 214 Ill. 2d 206, 217, 824 N.E.2d 262, 267 (2005). Stated another way, we will not reverse a conviction based upon insufficient evidence unless the evidence is so "improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of the defendant's guilt." Collins, 214 Ill. 2d at 217, 824 N.E.2d at 267-68.

Here the State presented a written confession by the defendant and the testimony of Patricia, his aunt, that he had admitted to her that he killed the victims. He accurately described to Patricia the manner of the victims' deaths, gunshots from a .38-caliber gun, and he enlisted his aunt's help in getting rid of such a gun. The defendant's fresh blood was found on the steering wheel and gearshift of Bradley's car. Furthermore, the defendant was seen driving Bradley's car away from Bradley's home after the murder, to a location near Patricia's home. Although the State's witnesses gave conflicting testimony at trial, it was for the jury as the trier of fact to resolve inconsistencies and determine the truth. See People v. Milka, 211 Ill. 2d 150, 178, 810 N.E.2d 33, 49 (2004). The defense also challenges the defendant's confession. The credibility of a confession and whether to believe all or part of it, is a matter for determination by the jury as the trier of fact. People v. Pecoraro, 144 Ill. 2d 1, 11, 578 N.E.2d 942, 946 (1991). Similarly, discrepancies between the

11

confession and other trial evidence present a question for the trier of fact. Pecoraro, 144 Ill. 2d at 11, 578 N.E.2d at 946. Based upon our examination of the totality of the evidence, we find that a rational trier of fact could find the essential elements of first degree murder beyond a reasonable doubt, and accordingly, the defendant's guilt was proven beyond a reasonable doubt.

Alternatively, the defendant asserts that he was denied a fair trial by the prosecutor's unsupported assertions regarding the defendant's motive and by the prosecutor's personal attacks on defense counsel during closing argument. The prosecutor told the jury that the murders may have escalated from a domestic dispute between the defendant and Bradley. At trial there was no objection to the prosecutor's comment regarding motive and therefore the defendant has forfeited this issue. People v. Enoch, 122 Ill. 2d 176, 185-86, 522 N.E.2d 1124, 1129-30 (1998). Furthermore, a harmless error analysis can only be made if there is error. The record reveals that the defense asserted to the jury that in deciding guilt or innocence it should consider that the defendant lacked a motive to murder the victims. The prosecutor's comments suggesting such a motive were in response to the defense argument regarding lack of motive and therefore are not error. People v. Evans, 209 Ill. 2d 194, 224-26, 808 N.E.2d 939, 956-57 (2004); People v. Hudson, 157 Ill. 2d 401, 445, 626 N.E.2d 161, 180 (1993).

Our analysis is also applicable to the defendant's complaint regarding the prosecutor's argument that the defendant's blood, found in Bradley's car, could have come from scratches made in self-defense by Bradley, who had long fingernails. Again, there was no objection to these comments at trial and the defendant has thus forfeited this issue. Enoch, 122 Ill. 2d at 185-86, 522 N.E.2d at 1129-30. Further, these facts do not support an analysis under the theory of plain error,

which would allow a review in spite of forfeiture. The prosecutor commented on photographs in evidence, which showed that Bradley had long fingernails. He was entitled to draw inferences from the evidence in order to explain how the defendant's blood may have gotten on the steering wheel and gearshift of the victim's car.

The defendant also complains of comments by the prosecutor which the defendant contends were personal attacks on defense counsel. The record reveals that defense counsel argued to the jury, without evidentiary foundation from any expert witness, that the bullet trajectories did not match the prosecution's theory of the murders. Defense counsel also told the jury that there was no blood spatter evidence supporting the prosecution's theory. The prosecutor responded by saying that defense counsel had become a "blood spatter expert" and a "trajectory expert." Because these comments were invited by defense counsel's argument and were made in response to that argument, we find neither error nor prejudice arising from them. Hudson, 157 Ill. 2d at 445, 626 N.E.2d at 180.

The defendant next asserts that he was denied a fair trial when the trial court permitted a medical examiner who had not performed the autopsies on the victims to testify to the results of the autopsies using the autopsy reports. The defendant asserts that this testimony infringed upon his constitutional right under the sixth amendment to cross-examine his accusers. Crawford v. Washington, 541 U.S. 36, 50, 158 L. Ed. 2d 177, 192, 124 S. Ct. 1354, 1364 (2004). Defense counsel failed to object to this testimony at trial and also failed to include a claim of error on this point in the posttrial motion, inaction which would ordinarily forfeit any claim of error. Enoch, 122 Ill. 2d at 185-86, 522 N.E.2d at 1129-30. Further, we do not find any prejudice. The defendant has

13

failed to make any rational argument regarding what advantage he would have gained by cross-examining the physician who performed the autopsies and prepared the reports. The medical examiner who did testify was merely relating the results of the autopsies as written in the autopsy reports. There was no issue as to the cause or manner of death of the victims. Accordingly, we reject the argument that the facts of this case should be analyzed in accordance with recent case law in Melendez-Diaz v. Massachusetts, 557 U.S. ___, 174 L. Ed. 2d 314, 129 S. Ct. 2527 (2009). In that case, the United States Supreme Court held that the prosecution violated the sixth amendment's confrontation clause by introducing the affidavit of a laboratory analyst concerning a laboratory drug test result without giving the defendant the opportunity to cross-examine the analyst. Melendez-Diaz, 557 U.S. at ___, 174 L. Ed. 2d at 321-22, 129 S. Ct. at 2532. An autopsy report is significantly different from a lab report of the type at issue in Melendez-Diaz. The inapplicability of Melendez-Diaz to the facts of the case is clear. The main focus of the testimony regarding the autopsy reports in this case dealt with the manner of death; specifically, establishing the fact that the victims were shot to death. At no time in the trial was the manner of death in dispute. The defendant's argument on this issue, taken to its logical conclusion, would yield absurd results. In any event, the defendant has utterly failed to show any resulting prejudice from the assistant medical examiner's testimony regarding the autopsy report.

Further, this was also not the type of structural error that our supreme court has said will require automatic reversal, regardless of forfeiture or lack of prejudice. People v. Glasper, 234 Ill. 2d 173, 197-98, 917 N.E.2d 401, 416 (2009). The United States Supreme Court has found that the infringement of four basic rights of defendants constitutes structural error requiring automatic

14

reversal: the right to counsel; the right to self-representation; the right to a public trial; and the right to trial by jury when an erroneous instruction on reasonable doubt affects that right. United States v. Gonzalez-Lopez 548 U.S. 140, 149, 165 L. Ed. 2d 409, 420, 126 S. Ct. 2557, 2564 (2006). Illinois courts have expanded that list to include infringement of the right to a jury trial by the denial of a defendant's request for special verdict forms where the answers to those forms could affect the defendant's sentence. People v. Smith, 233 Ill. 2d 1, 27-28, 906 N.E.2d 529, 542-43 (2009); People v. Glasper, 234 Ill. 2d at 192, 917 N.E.2d at 413; see People v. Moore, 397 Ill. App. 3d 555, 568-75, 922 N.E.2d 435, 446-57 (2009) (Quinn, J., specially concurring). The alleged error here does not fall into any of those categories. Accordingly, we hold that even assuming it was an error to permit one physician to testify concerning the results of an autopsy performed by another physician, that error was not reversible as it was not a structural error and there was no prejudice to the defendant where he has failed to demonstrate how cross-examination of the physician who performed the autopsies could have aided his defense or would have made any difference in the jury's determination of guilt.

The defendant next contends that he was deprived of his constitutional right to choose to testify because the trial court refused to determine, prior to trial, the admissibility of the defendant's prior convictions as impeachment. The trial court in this case had a standing policy of withholding its ruling on this type of motion until the trial had commenced and the defendant testified. At oral argument the State acknowledged this issue was then pending before our supreme court. People v. Tucker, No. 1-06-2619 (May 12, 2008) (unpublished order under Supreme Court Rule 23), appeal allowed, 231 Ill. 2d 684, 904 N.E.2d 985 (2009) (consolidated for appeal with People v. Averett,

381 Ill. App. 3d 1001, 1020, 886 N.E.2d 1123, 1140 (2008). Our supreme court has recently ruled on those consolidated cases. People v. Averett, Nos. 106362, 106621 cons. (April 15, 2010). In Averett, our supreme court had the opportunity to clarify the conflicting views regarding whether the trial court's blanket refusal to rule before the commencement of trial on a defendant's motion *in limine* to bar his impeachment with prior crimes constitutes reversible error regardless of whether the defendant ultimately testifies on his own behalf. The Averett court framed the issue as: whether a defendant may be entitled to relief on appeal after choosing not to testify at trial, if the trial court had a "blanket policy" of deferring rulings on motions *in limine* to exclude prior convictions for impeachment until after hearing the defendant's testimony at trial. Averett, slip op. at 15. Both Averett and Tucker chose not to testify in their respective trials after the trial court refused to rule on their motions *in limine* until it heard their trial testimony. Averett, slip op. at 11-12. The supreme court noted its ruling in Patrick that, except in rare cases, a trial court abuses its discretion by failing to make a pretrial ruling on such motions (Patrick, 233 Ill. 2d at 74-75, 908 N.E.2d at 6-7). Averett, slip op. at 15. The court then applied this holding to the cases of Averett and Tucker, holding that the trial courts abused their discretion by refusing to rule on the defendants' motions prior to trial and before the defendants actually testified. Averett, slip op. at 15. But on the question of whether the defendants in Averett were entitled to relief despite their decisions not to testify, the court first determined that the trial courts' errors in this regard were not structural and therefore did not require automatic reversal. Averett, slip op. at 16. The court also held that the trial courts' errors were not of a constitutional dimension, because the defendants were not prevented from choosing to testify and because the trial courts' blanket policies did not deprive the defendants of the "guiding hand of

counsel." Averett, slip op. at 11. Summarizing its holdings, the court stated:

> "In sum, we conclude that the trial court[s'] application of a
> blanket policy of deferring rulings on motions *in limine* did not
> violate the defendants' constitutional rights to testify or to the
> 'guiding hand of counsel.' The defendants' claims do not involve
> constitutional error subject to review on appeal despite their choice
> against testifying at trial." Averett, slip op. at 11.

Our supreme court also addressed the plain-error argument made by the defendant Averett. The court reaffirmed its holding in Patrick that a defendant's decision not to testify rendered the trial court's decision unreviewable because otherwise a reviewing court would be forced to speculate on the nature of the defendant's testimony and the questions which the prosecution would ask upon cross-examination. Averett, slip op. at 11 The court effectively held that a defendant would not be permitted to game the system:

> "Our decision in Patrick makes clear that a defendant's choice
> not to testify in these circumstances goes beyond normal forfeiture.
> The rationale of Patrick does not allow the defendants to 'have it both
> ways' by altering their trial strategies to make the best of the trial
> courts' deferrals of their rulings and later maintain on appeal that they
> are entitled to new trials because the deferrals of the rulings were
> erroneous. In these circumstances, the alleged error is unreviewable.
> Patrick, 233 Ill. 2d at 78-79[, 908 N.E.2d at 10-11]." Averett, slip op.

17

1-07-2697

at 12.

For these reasons, the court held that the plain-error rule was inapplicable.

Applying the principles outlined in <u>Averett</u> to this case, we conclude that the issue of the trial court's reservation of its ruling on defendant's motion *in limine* regarding the admissibility of his prior convictions is not reviewable. Because the defendant in this case made a decision not to testify, we cannot speculate about what the trial court's rulings would have been or about the effect that those decisions may have had on the outcome of the trial. Nor can we speculate about how the prosecution would have utilized the rulings as trial strategy or about what the defendant's response might have been. Accordingly, we hold that the facts of this case do not present reversible error as alleged by the defendant.

Finally, in a supplemental brief allowed by this court, the defendant asserts for the first time that the failure of trial counsel to object to the use of portions of out-of-court statements by prosecution witnesses constituted ineffective assistance of counsel. To establish ineffective assistance of counsel, a defendant must meet a two-part test: he must establish that counsel's performance was outside the range of professionally competent assistance and that without counsel's substandard performance, the results of the trial would have been different. <u>Strickland v. Washington</u>, 466 U.S. 668, 687-89, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2067 (1984). The out-of-court statement cited by the defendant is Patricia's written statement, in which she told the authorities that when the defendant came to her house, she asked him if he had killed the victims and he nodded yes. But contrary to the defendant's argument on appeal, Patricia's testimony on this point was consistent at trial. In her testimony at trial, Patricia *admitted* that she had previously told

18

the police that the defendant came to her home, where he told her the victims were dead and nodded his head in the affirmative when she asked if he had killed them. She also affirmatively testified at trial that she had asked the defendant this question and that he had nodded his head to say yes. Given this critical trial testimony by Patricia on the issue, it is clear that any error by defense counsel in failing to object to the prosecution's cumulative introduction of this evidence through Patricia's out-of-court written statement would not have affected the outcome of this trial. Consequently no prejudice or reversible error has been established. Accordingly, the defendant has failed to demonstrate that his trial counsel's failure to object to the prosecutor's substantive use of a witness's out-of-court statement would have affected the outcome of the trial, and therefore we find that any error in this regard was harmless.

For the reasons we have set forth, we affirm the defendant's convictions and sentence.

Affirmed.

HOFFMAN and KARNEZIS, JJ., concur.