JENNIFER FATIGATO *et al.*, Plaintiffs-Apellants, v. THE VILLAGE OF OLYMPIA FIELDS *et al.*, Defendants-Appellees (Holiday Inn-Matteson *et al.*, Defendants).

First District (6th Division)   No. 1—94—2340

Opinion filed May 17, 1996.

Thomas D. Fazioli, Paul B. Episcope, Ltd., and David A. Novoselsky & Associates (David A. Novoselsky and Margarita T. Kulys, of counsel), all of Chicago, for appellants.

Gregory E. Rogus and Paul E. Wojcicki, both of Segal, McCambridge, Singer & Mahoney, Ltd., of Chicago, for appellees.

JUSTICE McNAMARA delivered the opinion of the court:

Plaintiffs, Jennifer and Anthony Fatigato, are seeking recovery for injuries they sustained when an automobile crossed the median of Interstate 57 and struck their car. Alonzo Gaines, the driver of the other automobile, was killed in the accident. Plaintiffs named as defendants the estate of Alonzo Gaines, the Holiday Inn-Matteson and Matteson Hotel Corporation (Holiday Inn), the Village of Olympia Fields (Village), and two of the Village's police officers, Jeffrey R. Marshall and Randy Kickert. Plaintiffs alleged that Marshall and Kickert were guilty of willful and wanton conduct in that they directed Gaines to leave home after a domestic dispute and drive his automobile while highly intoxicated just prior to the collision with plaintiffs. Plaintiffs have settled with Gaines' estate and have voluntarily dismissed their dramshop action against the Holiday Inn. On appeal, plaintiffs seek the reversal of the trial court's grant of summary judgment in favor of the Village and Officers Marshall and Kickert.

The relevant facts are as follows. Vonceil Gaines testified at her deposition that on November 3, 1989, she returned home from work at approximately 5:30 p.m. At that time, her husband, Alonzo, and their daughter, Vonda, were at home. Alonzo was running throughout the house, and Vonda was visibly upset. Alonzo was angry because Vonceil had seen a lawyer about getting a divorce. Broken glasses and dishes covered the kitchen floor and countertops. In the bedroom, clothes were thrown everywhere, all the drawers were taken out of

the chests, and the lamp on the nightstand was knocked off and broken.

Alonzo continued his tirade after Vonceil arrived home. She saw him pull the cord out of the telephone, throw a family room chair into the fireplace, and take her jewelry out of the drawers and step on it. Vonceil knew Alonzo was drinking because he was loud and he slurred his words. During the argument, Alonzo drove off and returned three separate times. When he left the third time, he stated he was going to get some bullets so he could shoot Vonceil. He returned between 6:50 and 7 p.m. Vonceil and Vonda found Alonzo sitting on the floor in the garage, and Vonda helped him up. Alonzo and Vonda then became involved in a shoving match during which he slapped his daughter and tried to choke her. Vonceil got into her car and drove to the police station, which was two minutes away. The station was locked when she arrived. Shortly thereafter, Vonda arrived at the station in her car and called the police from a public phone. They returned home with a police car behind them.

Vonceil told the two police officers that her husband was ranting and raving and in a tirade. She also told them that he had threatened to shoot her. They asked he if he had been drinking, and she said yes. She believed that Vonda said that Alonzo had tried to choke her. When they went back into the house, Alonzo was lying in bed. One of the officers remained in the living room, and the other went into the bedroom with Vonceil. Vonceil told Alonzo that the police were there, and the officer asked her to leave the room. She did not hear the conversation he had with Alonzo. After about five minutes, Alonzo and the officer came out of the room. Alonzo did not say anything. The officers told Vonceil and Vonda that Alonzo would be gone for the night and that the police would watch the house. Alonzo went outside and got into his car.

One of the officers then said that Alonzo had struck another car. Vonceil did not see or hear the collision, but when she walked to the front door, she saw that he had backed into Vonda's car. The officer asked Vonda if she wanted to press charges. Vonda said yes, and the officer filled out a form. The officers were at the house for approximately 15 minutes. Alonzo left before the report was finished. He was subsequently killed in the automobile accident in which plaintiffs were injured.

Vonda Gaines testified at her deposition that on November 3, 1989, she returned home from work sometime after 3 p.m. Her father was already at home, and he was packing his clothes. Vonda went into her room, and her father came in to talk to her. He told her that he and Vonceil were getting divorced. He also commented on Von-

da's lack of concern. He did not appear intoxicated at that time, but Vonda could smell the odor of alcohol on his person. He appeared agitated. He did not slur his words.

Vonda remained in her bedroom when her mother came home. After a few minutes, Vonda heard a glass break in the kitchen and she heard her parents arguing and swearing. She heard doors slamming and chairs being thrown. Her parents argued for a long time. The next time Vonda talked to her father was when he called her into the kitchen. She talked to him for about 15 minutes. During that time, he drank wine and hard liquor. After Vonda left the kitchen, her parents began arguing again, and her father threw a chair at a glass table. Alonzo then left in his car for about 10 minutes and came back. He left a second time for about 20 minutes.

Later, a neighbor rang the doorbell and said that Alonzo looked like he had fallen in the garage. Vonda and Vonceil went out to the garage and saw Alonzo lying on the pavement. He was conscious and appeared intoxicated. Vonda smelled alcohol on his breath. Once on his feet, Alonzo was weaving and appeared unsteady. After Vonda helped him up, her father attempted to choke her. Her mother ran out the door. Vonda punched Alonzo in his midsection, and he let her go. Vonda ran out the door and drove to the police station. The door was locked, so she called the police from the public telephone next to the station. After making the phone call, she saw her mother sitting in her own car. She did not converse with Vonceil, and they drove home separately. When Vonda arrived home, her father was in the kitchen. He started swearing at her and he grabbed her. Vonda broke free of his grasp and grabbed a poker from the fireplace. Her father dropped to his knees and started crying. He appeared intoxicated and was emotionally upset.

The police and Vonda's mother arrived approximately 15 minutes later. Vonda hid, but she heard the officers ask her father to leave the house. The officers were in the house for about 15 minutes. When she heard them leave with her father, Vonda came out into the living room. She watched Alonzo get into his car, back out of the driveway, and strike her car, which was parked across the street from the driveway. The driver's side door of her car was damaged so that it could not open. The police officers were outside when this happened. The officers came back inside and asked her if she wanted to file a police report. Alonzo had already left the scene. Vonda did not remember whether she or her mother told the officers that her father was intoxicated. She did not tell the police that she wanted him arrested.

Officer Kickert testified at his deposition that on November 3,

1989, he was contacted by radio of a disturbance at 3511 Doria Lane. He and Officer Marshall arrived at the same time in separate cars. Vonceil and Vonda met them on the driveway. Vonceil told them that her husband had an argument with their daughter and that he had started to get physical with Vonda. Vonda said that Alonzo put his hands on her and tried to strangle her. The officers asked Vonda and Vonceil if they were all right, and they said yes. The officers asked whether they wanted Alonzo arrested, and they both said absolutely not. Vonceil indicated that it would be best if her husband left the house. The officers did not ask if Alonzo was drinking, and the women never stated that he was.

Upon going inside the house, Vonceil directed the officers to the bedroom. Kickert entered the room, and Marshall remained in the doorway. Kickert did not notice any broken furniture or things thrown around. Everything appeared normal in the bedroom. Alonzo was lying on the bed, and when Kickert called out "Mr. Gaines," he sat up immediately. Kickert advised Alonzo that his wife thought it would be best if he spent the night somewhere else. The officers watched as Alonzo gathered some personal items. Kickert did not smell any alcohol, but he was not close enough to Alonzo to smell his breath. Alonzo appeared sober and very alert. His speech was not slurred, and his walk was steady. In the dining room, Alonzo asked his wife for his car keys. She left the room, returned, and handed Alonzo his keys. During the time Kickert and Marshall were in the bedroom with Alonzo, a police lieutenant and a sergeant had come to the scene. After Alonzo got his keys, all four officers and Alonzo walked out together. The lieutenant and sergeant then left.

Kickert saw Alonzo get in his car, but he did not watch him back out of the driveway. Kickert became aware of the collision with Vonda's car when he heard a noise. Kickert walked over to the car and asked Alonzo to pull up alongside the road. He retrieved Alonzo's driver's license and went over to discuss the matter with Marshall. Marshall talked to Vonceil, and she indicated that both cars were insured under the same company. Kickert and Marshall saw no reason to detain Alonzo because they could get all the necessary insurance information from his wife. Alonzo told Kickert that the position of the squad cars made it difficult to back out of the driveway. Alonzo never got out of his car, and the officers made out the police report after he left. The report indicated that Alonzo was emotionally upset when the accident occurred. The report did not indicate that Alonzo had been drinking because Kickert had no knowledge that Alonzo had consumed any alcohol.

Officer Marshall testified at his deposition that on November 3,

1989, he did not have any indication that Alonzo had consumed any alcohol. He was never close enough to smell his breath, but Alonzo had no problems walking or speaking. Neither Vonceil nor Vonda told the officers that Alonzo was drinking. Upon entering the house, Marshall did not notice any broken glass or thrown furniture. When Marshall and Kickert proceeded to the bedroom, Alonzo was lying in bed. They awoke him and explained to him that his wife thought he should leave. Alonzo gathered some things and they exited the bedroom. Alonzo asked his wife for his car keys, and she gave them to him. A lieutenant and a sergeant had also arrived at the residence to see if any assistance was necessary. The four officers and Alonzo walked out of the house together. Marshall did not ask Alonzo whether he had consumed any alcohol.

After Alonzo got into his car, Marshall heard what sounded like a collision. Marshall then observed that Alonzo's car was touching a car across the street. The lieutenant and sergeant had already left the scene, and Marshall and Kickert discussed how to handle the automobile accident. Marshall did not talk to Alonzo after he collided with his daughter's car. He discovered from Vonceil that she had all the necessary insurance information. Alonzo eventually left the scene and the officers went back inside to finish the report.

The record reveals that Alonzo hit Vonda's car at 7:38 p.m. At 7:52 p.m., Alonzo's northbound car crossed the 40-foot grass median on Interstate 57 and struck plaintiffs' car in the southbound lanes. Plaintiffs sustained serious injuries in the accident. Alonzo was pronounced dead on arrival at Olympia Fields Hospital. An autopsy revealed that the alcohol level in Alonzo's blood was 189 mg/dl.

Plaintiffs filed a complaint at law against the estate of Alonzo Gaines, and that action was subsequently settled. Plaintiffs also filed this action against the Holiday Inn, the Village, Kickert, and Marshall. Count I of plaintiffs' first amended complaint was a dramshop action against the Holiday Inn. Count II, directed at the Village and the officers, alleged that Kickert and Marshall acted in a willful and wanton manner for permitting Alonzo to operate his automobile while highly intoxicated. Count III alleged that the officers acted in a willful and wanton manner in that they affirmatively instructed Alonzo to drive while highly intoxicated. Count IV alleged that the officers' failure to take Alonzo into custody amounted to willful and wanton conduct.

The trial court dismissed with prejudice count IV of plaintiffs' complaint. The trial court also granted plaintiffs' motion to voluntarily dismiss count I brought against the Holiday Inn. Neither of these counts is pertinent to this appeal. (Consequently, "defendants" here-

after refers only to the Village, Marshall, and Kickert.) On June 23, 1994, the trial court granted defendants' motion for summary judgment as to counts II and III, finding that defendants were immune from liability under the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act or Act) (Ill. Rev. Stat. 1989, ch. 85, par. 1—101 *et seq.* (now 745 ILCS 10/1—101 *et seq.* (West 1992))). The trial court's order stated:

> "These facts do not fall within the 'special duty exception' of the Tort Immunity Act as set forth in the established case law. [Citations.] No Illinois case law has extended the exception to apply to an injury to a third person who is not under the direct and immediate control of employees or agents of the municipality. It would be inappropriate for this trial court to create a further exception to the Tort Immunity Act, as these matters lie within the province of the upper courts."

Plaintiffs now appeal the grant of summary judgment.

Summary judgment is proper where the pleadings, depositions, admissions, and affidavits on file "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2—1005(c) (West 1992). A trial court's grant of summary judgment is subject to *de novo* review on appeal. *Demos v. National Bank of Greece*, 209 Ill. App. 3d 655, 567 N.E.2d 1083 (1991). Summary judgment should only be allowed where the right of the moving party is clear and free from doubt. *Purtill v. Hess*, 111 Ill. 2d 229, 489 N.E.2d 867 (1986).

On appeal, plaintiffs contend that summary judgment in favor of defendants is improper. Plaintiffs argue that, in *Doe v. Calumet City*, 161 Ill. 2d 374, 641 N.E.2d 498 (1994), decided after the trial court's ruling, the supreme court clarified that defendants can be held liable for willful and wanton conduct even if they had no special duty or relationship to plaintiffs. Plaintiffs further argue that since there are genuine issues of material fact as to whether defendants' conduct was willful and wanton, the trial court's grant of summary judgment must be reversed.

Defendants respond that the trial court properly entered summary judgment since the officers did not owe plaintiffs, who were members of the general public, an enforceable legal duty to protect them from an allegedly intoxicated motorist. Defendants further argue that while plaintiffs seek recovery under the willful and wanton exception of section 2—202 of the Tort Immunity Act (Ill. Rev. Stat. 1989, ch. 85, par. 2—202), defendants are immune under more specific provisions of the Act that do not contain exceptions for willful and wanton conduct. Defendants also argue that plaintiffs

have waived the argument that willful and wanton conduct is a separate exception to the Tort Immunity Act by failing to present it to the trial court.

In making their arguments, the parties have pointed to several sections of the Tort Immunity Act. Section 2—202 of the Act provides:

"A public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." Ill. Rev. Stat. 1989, ch. 85, par. 2—202.

Willful and wanton conduct is defined by the Act as:

"[A] course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." Ill. Rev. Stat. 1989, ch. 85, par. 1—210.

While plaintiffs rely on the above two provisions, defendants point to the following sections. Section 4—102 provides:

"Neither a local public entity nor a public employee is liable for failure *** to provide adequate police protection or service, failure to prevent the commission of crimes, failure to detect or solve crimes, and failure to identify or apprehend criminals." Ill. Rev. Stat. 1989, ch. 85, par. 4—102.

Section 4—107 provides:

"Neither a local public entity nor a public employee is liable for an injury caused by the failure to make an arrest or by releasing a person in custody." Ill. Rev. Stat. 1989, ch. 85, par. 4—107.

In *Doe v. Calumet City*, 161 Ill. 2d 374, 641 N.E.2d 498 (1994), as in the present case, all four of the above sections were implicated, and the supreme court construed these provisions in the context of willful and wanton allegations made against a municipality and its police officers. In *Doe*, an intruder broke into a woman's apartment in the middle of the night and threatened to rape and kill her. The woman, Jane Doe, pleaded with the man not to attack her in front of her two children. As the man directed the children out of the bedroom, Jane ran out the front door of the apartment. The intruder then locked himself inside the apartment with the children. When the police arrived at the scene, Jane pleaded with the supervising officer to break down the door, but he declined to do so. Other officers restrained Jane and prevented the neighbors from breaking down the door. The officers knocked on the door and tapped on the window, but did not attempt to gain entry to the apartment. After approximately 30 minutes had passed since the break-in, a police department investigator arrived and discovered that the back door to the apartment was unlocked. Upon entering the apartment, the

investigator found that the intruder had repeatedly raped Jane's daughter and had choked and threatened her son.

Jane, on behalf of herself and her children, filed a complaint against Calumet City, the supervising officer, and several other officers charging them with negligence, intentional infliction of emotional distress, and gender discrimination. The negligence count contained an allegation that defendants acted in a willful and wanton manner. The issue before the supreme court was whether the complaint could survive defendants' motion to dismiss. Although Jane did not bring a separate willful and wanton count, the supreme court first asked whether the complaint stated a cause of action for simple negligence and then determined whether it stated a cause of action for willful and wanton conduct.

In addressing the negligence count, the court noted that at common law, a municipality owes no duty to the general public to supply police or fire protection. "This 'public duty' rule prevented a plaintiff's recovery for negligence." *Doe*, 161 Ill. 2d at 385. The General Assembly codified this general immunity against negligence at sections 4—102 and 4—107 of the Tort Immunity Act. *Doe*, 161 Ill. 2d at 385, citing Ill. Rev. Stat. 1987, ch. 85, pars. 4—102, 4—107. The *Doe* court noted, however, that "[a]n exception to both the common law public duty rule and the statutory immunities has evolved where the actions of the municipality's agent showed a special relationship with the plaintiff that created a duty different from the duty owed to the general public." *Doe*, 161 Ill. 2d at 385-86. The court went on to find that "plaintiffs' complaint [did] not allege sufficient facts to show that [Jane's children] Betty and John were under the direct and immediate control of defendants." *Doe*, 161 Ill. 2d at 387. The officers did not owe plaintiffs a "special duty" and, therefore, they were immune from the simple negligence count. *Doe*, 161 Ill. 2d at 387-88.

The court next turned to Jane's allegation that the officers acted in a willful and wanton manner. Pointing to the exception for willful and wanton conduct in section 2—202 of the Tort Immunity Act, the court stated:

> "We must decide whether this exception applies to police officers *owing no special duty to plaintiff.* In addition, if the exception applies, we must determine whether plaintiffs' complaint alleges sufficient facts to create a jury question regarding the willful and wanton nature of defendants' conduct." (Emphasis added.) *Doe*, 161 Ill. 2d at 388.

The supreme court was aware that trial and appellate courts had taken various approaches in construing the willful and wanton language in section 2—202. The trial court in *Doe* dismissed Jane's

complaint because it was under the impression that a special duty was also required to recover for injuries caused by willful and wanton conduct. *Doe*, 161 Ill. 2d at 389. Other courts found that the immunities provided by sections 4—102 and 4—107 were more specific and prevailed over section 2—202. In effect, police officers became immune even for willful and wanton conduct. *Doe*, 161 Ill. 2d at 389, citing *Luber v. City of Highland*, 151 Ill. App. 3d 758, 502 N.E.2d 1243 (1986); *Jamison v. City of Chicago*, 48 Ill. App. 3d 567, 323 N.E.2d 118 (1977). The proper approach, however, according to the *Doe* court, was set forth in *Leone v. City of Chicago*, 156 Ill. 2d 33, 619 N.E.2d 119 (1993), where the supreme court "held that the judicially created special duty exception and the statutory willful and wanton exception were separate and distinct exceptions to municipal and officer liability." *Doe*, 161 Ill. 2d at 389. Put another way, "plaintiffs can escape the statutory immunities granted municipalities and their employees either by proving facts that show the existence of a special duty and proving simple negligence or by proving willful and wanton conduct alone." *Doe*, 161 Ill. 2d at 390. The supreme court recently reiterated this position in *Calloway v. Kinkelaar*, 168 Ill. 2d 312, 328, 659 N.E.2d 1322 (1995), where the court stated that "in cases involving allegations of willful and wanton misconduct, the special duty doctrine has no application."

■ ■ Turning to the present case, we initially reject defendants' position that plaintiffs have waived their argument that willful and wanton conduct is a separate exception to the Tort Immunity Act. From the time plaintiffs filed their complaint, their position has clearly been that defendants acted in a willful and wanton manner as set forth in section 2—202 of the Tort Immunity Act. Ill. Rev. Stat. 1989, ch. 85, par. 2—202. We also reject defendants' argument that they are entitled to summary judgment because sections 4—102 and 4—107 prevail over section 2—202 and provide defendants immunity as a matter of law from plaintiffs' allegations of willful and wanton conduct. The *Doe* court specifically decided not to adopt this approach in construing sections 2—202, 4—102, and 4—107 in the context of willful and wanton allegations. *Doe*, 161 Ill. 2d at 389. Moreover, section 2—202 applies here because, in responding to the domestic dispute at the Gaines' residence, Marshall and Kickert were clearly involved "in the execution or enforcement of *** [the] law." Ill. Rev. Stat. 1989, ch. 85, par. 2—202.

We agree with plaintiffs that, under *Doe*, police officers can be held liable for injuries proximately caused by their willful and wanton conduct in the enforcement and execution of the law even if they owed no special duty to the injured parties and the injured par-

ties were not under the officers' direct and immediate control. As the supreme court has recently stated:

> "Our precedent has *** established that an actionable theory against municipalities for conduct of law enforcement agents can be stated (1) where the elements of the special duty doctrine are satisfied and the negligent breach of this special duty proximately caused plaintiff's injuries; or (2) where the alleged conduct of the officers is willful and wanton and proximately caused plaintiff's injury and the applicable statute allows recovery." *Calloway*, 168 Ill. 2d at 328.

Defendants insist, however, that they cannot be held liable because they did not owe plaintiffs, who were members of the general public, any duty individually. Yet, by urging us to affirm the trial court on the basis that there was no special relationship between plaintiffs and defendants, defendants are asking us to ignore the supreme court's mandate that where a plaintiff alleges willful and wanton conduct, the special duty exception is not applicable. *Doe*, 161 Ill. 2d at 389. Under our reading of *Doe*, the fact that plaintiffs were never under defendants' direct and immediate control does not automatically negate any chance of liability for willful and wanton conduct under section 2—202 of the Tort Immunity Act.

■ We must next determine whether any genuine issues of material fact exist as to whether defendants acted in a willful and wanton manner so as to preclude summary judgment in their favor. In both *Doe* and *Calloway*, the supreme court stressed that whether conduct is willful and wanton is ultimately a question for the jury. *Calloway*, 168 Ill. 2d at 326; *Doe*, 161 Ill. 2d at 390. It is within a court's province, however, to hold as a matter of law that an officer's actions did not amount to willful and wanton conduct when no other contrary conclusion can be drawn. *Doe*, 161 Ill. 2d at 390; *Urban v. Village of Lincolnshire*, 272 Ill. App. 3d 1087, 651 N.E.2d 683 (1995).

In the present case, several questions of fact preclude summary judgment in defendants' favor. The record contains four versions of what happened on November 3, 1989, and the contradictions and inconsistencies are numerous. Vonceil testified that she told the officers that Alonzo was drinking. The officers testified that they were not told that Alonzo had consumed any alcohol and that they did not ask. Vonceil stated that she knew Alonzo was drinking because he was loud and slurred his words. Vonda testified that her father smelled of alcohol, his gait was unsteady, and that he was obviously intoxicated and emotionally upset just before the officers arrived. The officers testified, however, that they had no reason to think that Alonzo had been drinking. They stated that his speech was clear and

his walk was steady. While Vonceil and Vonda gave detailed testimony about Alonzo's fit of anger during which he threw and broke things throughout the house, the officers testified that the house was in order and they did not notice anything broken or out of order. The officers testified that Vonceil retrieved and handed Alonzo his car keys. Vonceil testified that Alonzo did not say anything to her when he came out of the bedroom and that she did not have his keys. All four deponents testified that just before leaving home, Alonzo was involved in an automobile accident with Vonda's car. The officers testified, however, that they still had no reason to believe that Alonzo was drinking and that they had no reason to detain him.

Alonzo's collision with Vonda's car occurred at 7:38 p.m. The accident in which he was killed and plaintiffs were injured occurred 14 minutes later, at 7:52 p.m. The autopsy report shows that Alonzo's blood-alcohol level was well over the legal limit. Although defendants now object to the admissibility of the toxicology report, the report is a business record (134 Ill. 2d R. 236(a)), and it was not objected to in the trial court. Based upon the testimony given by Vonda and Vonceil, the toxicology report, and the very short time between the two automobile accidents, the inference could be drawn that the officers knew or should have known that Alonzo was highly intoxicated when he drove away that evening just prior to the accident with plaintiffs. Furthermore, looking at the record in light most favorable to plaintiffs, a jury could conclude that defendants' "course of action *** show[ed] an utter indifference to or conscious disregard for the safety of others or their property." Ill. Rev. Stat. 1989, ch. 85, par. 1—210.

In reviewing the trial court's grant of summary judgment, our role is to determine whether any issues of material fact exist; it is not to try those issues. *Green v. International Insurance Co.*, 238 Ill. App. 3d 929, 605 N.E.2d 1125 (1992). Here, defendants' right to judgment is not clear and free from doubt, and these questions of fact should go to a jury. Accordingly, the judgment of the circuit court of Cook County is reversed and remanded for further proceedings.

Reversed and remanded.

ZWICK, P.J., and EGAN, J., concur.