FIFTH DIVISION
August 30, 2010

1-07-2757

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | 03 CR 646 |
| | ) | |
| ARMANDO ANTONIO, | ) | The Honorable |
| | ) | Dennis A. Dernbach, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE TOOMIN delivered the opinion of the court:

Here, we revisit whether a defendant's right of confrontation was abridged by a pathologist's testimony narrating the examinations and observations of nontestifying experts. Following a jury trial, defendant, Armando Antonio, was convicted of involuntary manslaughter and concealment of a homicidal death and subsequently sentenced to terms of 14 years' imprisonment and 5 years' imprisonment, respectively. Defendant now appeals contending: (1) his right to confront witnesses was denied; and (2) he was prejudiced by the introduction of other crimes evidence. For the reasons that follow, we affirm.

BACKGROUND

The charges against defendant stemmed from the disappearance of Elvia Torres-Bahena. As defendant's claims of error do not hinge upon the sufficiency of the evidence, we confine our review of the facts to those necessary to convey an understanding of the cause and our resolution of the appeal.

Elvia Torres-Bahena was last seen or heard from on June 28, 2002. At that time, she was in the midst of attempting to bring her son to Chicago from Mexico. Beginning in May of 2002, Elvia lived with defendant. According to Elvia's mother, Antonia Bahena Martinez, defendant had arranged to travel to Mexico on July 5, 2002, to accompany Elvia's son, Marcos, back to Chicago. This was planned despite the fact that the boy lacked a visa to enter the country. Antonia last spoke with her daughter on June 28, 2002. Though the two of them spoke often, Antonia did not hear from Elvia again after the conversation.

In turn, Antonia contacted her sister-in-law, Maria Bahena, who lived in Houston. Maria agreed to come to Chicago to report Elvia missing. She was accompanied by a police officer to the apartment Elvia shared with defendant at 2711 South Tripp in Chicago. The police officer entered the apartment through a window and allowed Maria inside the apartment. Maria observed women's shoes and clothing, luggage, and photographs of unknown individuals. Thereafter, Maria filed a missing person's report and returned to Texas.

The manager of the building testified that he last saw Elvia when he went to collect rent from defendant. Thereafter, he did not see defendant for about a month, when defendant indicated he had left "the young lady" and that it was likely she was with another man.

On August 12, 2002, defendant was interviewed by Detective Doreen Velasquez at his workplace. Velasquez described defendant as "fidgety and nervous" during the conversation. He was asked about the last time he saw Elvia. Defendant responded that they had ended their relationship in June 2002, and he then went to Mexico for approximately one month in order to visit his mother and his "real girlfriend." Defendant theorized that because Elvia possessed keys

to his apartment, she might have moved during his trip to Mexico.

Defendant denied having arranged to accompany Elvia's son to Chicago. He claimed it was, in fact, a man from Minnesota who was involved in that plan. Furthermore, defendant suggested, "[P]erhaps [the man from Minnesota] did something to [Elvia], too." Several times during the interview defendant indicated he was nervous about the possibility of deportation. However, nothing defendant said raised Detective Velasquez's suspicions and he was not arrested at that time.

Defendant was ultimately arrested on an unrelated traffic stop on December 9, 2002. He was taken into custody by Detective Sam Dickerson of the fugitive apprehension unit. When Dickerson conducted a custodial search of defendant, he recovered two money order receipts for $700 and $800. They were made out to defendant and listed "Miss Torres" as the payor.

Following his arrest by Detective Dickerson, defendant was interviewed on December 10, 2002, by Detective Maria Pena. Defendant maintained he last saw Elvia on June 28, 2002, before he left for a vacation in Mexico. Upon his return, he discovered she was gone and he discarded her remaining belongings. Defendant offered the possibility that Elvia fled the country with the $5,000 he purportedly gave her to purchase a vehicle. Defendant denied speaking with Elvia's family or agreeing to pick up her son in Mexico. Moreover, defendant believed his refusal to accompany Elvia's son might have caused her to be angry with him. When asked about the money orders, defendant claimed they were in payment of a debt owed to him by Elvia. He did not explain the nature of the debt.

Despite initially denying that he had access to a computer, a search of defendant's living

3

quarters uncovered a desktop computer. The following day defendant was confronted with this discovery. Thereafter, he consented to a search of the computer.

During a subsequent discussion, defendant told Pena he had not been truthful previously and now wanted to tell her about Elvia. Defendant explained that, on or about June 26, 2002, he and Elvia discussed traveling to Mexico to retrieve her son. The two of them drove to the border between the United States and Mexico. On arriving at the border, they paid a "coyote" – a person who could get people across the border illegally – $700 to get them into Mexico. The coyote rode in the car with them. Along the way they were attacked, beaten, and robbed. Defendant and Elvia agreed to return to the United States because they no longer had any money. The only way to get back was to swim across a river. As they swam, the currents became "very rough and high" and defendant lost Elvia. According to defendant, once he reached the shore he walked to a nearby home and asked for dry clothes. He then hitchhiked to his parents' home. He spent a couple of days with his parents, went sightseeing, and then returned to Chicago. Upon his return to Chicago, defendant threw Elvia's possession in the garbage.

Following this interview, Pena spoke with Detective Lerch concerning the contents of defendant's e-mails. Pena informed defendant the e-mails were not consistent with his version of events. Specifically, one message, between Elvia and her friend, indicated she was happy and excited about defendant going to Mexico to get her son. Elvia was looking forward to their arrival in Chicago, which she anticipated to be some time in July. Following this confrontation, defendant asked for a cigarette and again told Pena he would tell her the truth.

Defendant described an argument with Elvia that started because defendant no longer

wished to go to Mexico to bring her son back. The argument took place in the bedroom of the apartment at 2711 South Tripp in Chicago. According to defendant, Elvia was insistent that he go to Mexico. Defendant pushed her. Elvia fell and struck her head on a piece of furniture. Defendant then called her name several times. When Elvia did not respond, he checked for a pulse, but did not find one. He saw blood coming from Elvia's nose. Defendant wiped the blood away and then carried her to his van. Pena denied that defendant ever told her that what happened was an accident.

Defendant drove around for a while, knowing he had to discard the body. He parked in the area of the 700 block of Kilbourn in Chicago. Defendant spent 20 to 40 minutes considering his options. He decided to discard the Elvia's corpse in the sewer. Upon realizing the body would not fit in one piece, he resolved to cut it up. Using a knife he found in the back of his van, defendant cut the body in half. He placed the parts in a plastic bag and disposed of them in the sewer. Thereafter, he sold the van.

Following his confession, defendant went with Pena and other detectives to the 700 block of Kilbourn, where he pointed out the sewer he used. Several detectives removed the sewer cap and located a clear plastic bag containing a torso without a head. The streets and sanitation department was contacted to assist with the removal of the body. Defendant was returned to Area 4 Headquarters, where he gave a videotaped statement. In the statement, defendant inculpated himself, but nonetheless asserted that what happened to Elvia was an accident.

Subsequent mitochondrial DNA analysis determined that Elvia could not be excluded as the source of the DNA found in the femur and rib submitted for analysis. The DNA in those

body parts was compared to that of her mother and son. The analysis determined the profile present would occur in 1 out 119 unrelated Hispanics.

After the State rested, defendant made several motions. The first was to dismiss the first degree murder counts for failure to establish a *corpus delicti*. Defendant likewise moved for a directed finding. Defendant's motions were denied. Defendant called two witnesses, his former roommate and his brother, as a part of the defense case. However, defendant did not testify.

Following summations, the jury was instructed. Among the instructions was one on involuntary manslaughter, as requested by defendant. The jury returned verdicts of guilty of involuntary murder and concealment of a homicidal death. Defendant's motion for a new trial was denied. In turn, he was sentenced to consecutive terms of 14 years' imprisonment for involuntary manslaughter and 5 years' imprisonment for concealment of a homicidal death. This appeal followed.

ANALYSIS

Defendant first contends he was denied his right of confrontation where the testifying medical examiner did not personally perform the postmortem examinations. Defendant contends this evidence was inadmissible because it violated his sixth amendment right to confront witnesses against him. In crafting his argument, defendant relies heavily upon *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), and *Melendez-Diaz v. Massachusetts*, ___ U.S. ___, 174 L. Ed. 2d 314, 129 S. Ct. 2527 (2009). The State counters that this claim of error was forfeited and notes that defendant concedes it is being raised for the first time on appeal. Consequently, both sides take the position that review of this issue must be

based upon the plain-error doctrine.

Supreme Court Rule 615(a), or the plain-error doctrine, delineates an exception permitting review of issues otherwise subject to procedural default. *People v. Lewis*, 234 Ill. 2d 32, 42, 912 N.E.2d 1220, 1226-27 (2009); 134 Ill. 2d R. 615(a). Our supreme court described the circumstances under which the doctrine is operative in *People v. Piatkowski*:

> "[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the serousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 411 (2007), citing *People v. Herron*, 215 Ill. 2d 167, 186-87, 830 N.E.2d 467, 479 (2005).

Rule 615 specifically provides that, "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." 134 Ill. 2d R. 615(a). "Essentially, the fairness of the trial must be undermined." *People v. Keene*, 169 Ill. 2d 1, 17, 660 N.E.2d 901, 910 (1995). The burden of persuasion as to the two prongs falls upon those defendants seeking the application of the doctrine. *People v. Naylor*, 229 Ill. 2d 584, 593, 893 N.E.2d 653, 659 (2008). Where a defendant cannot carry the burden, it is incumbent upon us to honor the procedural default. *Naylor*, 229 Ill. 2d at 593, 893 N.E.2d at 659-60.

Manifestly, we must ascertain whether an error actually occurred. *Lewis*, 234 Ill. 2d at 43, 912 N.E.2d at 1227, citing *People v. Walker*, 232 Ill. 2d 113, 124, 902 N.E.2d 691, 697 (2009). Therefore, we consider the substance of defendant's claim of error. *Lewis*, 234 Ill. 2d at 43, 912 N.E.2d at 1227.

Dr. Nancy Jones of the Cook County medical examiner's office testified to having reviewed the entire case file, including the reports and examinations of the decomposed torso conducted by Dr. Choi, Dr. Snow's report of his examination of the skeletal remains, and photographs taken during the stages of examination. Choi's report described a partially decomposed and partially dismembered human torso. X-ray examinations of the torso did not reveal any foreign metallic objects or projectiles. Moreover, the internal organs had decomposed. However, bones and parts of bones were identified. There were no other indications of trauma to the body beyond the dismemberment. Based on his examination, Choi was unable to determine a cause or manner of death.

Following this examination, Choi contacted Snow, a forensic anthropologist, to examine the skeletal remains. Snow's report concluded the remains belonged to a female, between the ages of 30 and 45, who was less than 5 feet 5 inches in height. The pubic bones exhibited changes consistent with having had children. Snow found no evidence of antemortem injuries to the bones. He concluded the body was dismembered using a hacksaw, handsaw, or another similar manual device, as opposed to a power saw. Snow opined that the head was likely removed in a similar manner, despite the absence of a skull or cerebral vertebrae for examination. Snow was likewise unable to determine a cause of death.

Notably, defendant's argument regarding Dr. Jones's testimony gives only the most cursory attention to the underlying issues concerning the confrontation clause, particularly insofar as hearsay is concerned. Defendant's very focused attention to the absence of an opportunity to confront Drs. Choi and Snow makes an analytical leap of logic, while ignoring the logical underpinnings and holdings contained in the body of precedent in this area. As the State aptly notes, the analysis must necessarily consider hearsay, the nature of the testimony – whether it is testimonial or nontestimonial – and the nature of the evidence forming the basis for the testimony.

The fundamental guarantee of the sixth amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him." U.S. Const., amend. VI. The Illinois constitution likewise makes the same guarantee. Ill. Const. 1970, art. I, §8. Critical to an understanding of the constitutional principle of confrontation is an understanding of its interrelationship with hearsay. As the Supreme Court explained in *California v. Green*:

>    "While it may readily be conceded that hearsay rules and the Confrontation Clause
>
>    are generally designed to protect similar values, it is quite a different thing to suggest
>
>    that the overlap is complete and that the Confrontation Clause is nothing more or less
>
>    than a codification of the rules of hearsay and their exceptions as they existed
>
>    historically at common law. Our decisions have never established such a
>
>    congruence; indeed, we have more than once found a violation of confrontation
>
>    values even though the statements in issue were admitted under an arguably

9

recognized hearsay exception. [Citation.] The converse is equally true: merely because evidence is admitted in violation of a long-established hearsay rule does not lead to the automatic conclusion that confrontation rights have been denied." *California v. Green*, 399 U.S. 149, 155-56, 26 L. Ed. 2d 489, 495-96, 90 S. Ct. 1930, 1933-34 (1970).

As the Court noted in *Ohio v. Roberts*, a literal reading of the confrontation clause – *i.e.* that all statements by declarants not present at trial would be excluded – would cause it to "abrogate virtually every hearsay exception, a result long rejected as unintended and too extreme." *Ohio v. Roberts*, 448 U.S. 56, 63, 65 L. Ed. 2d 597, 606, 100 S. Ct. 2531, 2537 (1980). Additionally, when referring back to *Green*, the *Roberts* Court observed: "The historical evidence leaves little doubt, however, that the Clause was intended to exclude some hearsay." *Roberts*, 448 U.S. at 63, 65 L. Ed. 2d at 606, 100 S. Ct. at 2537. Moreover, the Court recognized an historical "preference for face-to-face confrontation at trial" and the importance of cross-examination. *Roberts*, 448 U.S. at 63, 65 L. Ed. 2d at 606, 100 S. Ct. at 2537. Yet, the Court left open the possibility of fluidity in the development of the rules across jurisdictions:

"The Court, however, has recognized that competing interests, if 'closely examined,' *Chambers v. Mississippi*, 410 U.S. [284,] 295 [(1973)], may warrant dispensing with confrontation at trial. See *Mattox v. United States*, 156 U.S. [237,] 243 [(1895)] ('general rules of law of this kind, however beneficent in their operation and valuable to the accused, must occasionally give way to considerations of public policy and the necessities of the case'). Significantly, every jurisdiction has

a strong interest in effective law enforcement, and in the development and precise formulation of the rules of evidence applicable in criminal proceedings." *Roberts*, 448 U.S. at 64, 65 L. Ed. 2d at 606-07, 100 S. Ct. at 2538.

Next, in *White v. Illinois*, 502 U.S. 346, 116 L. Ed. 2d 848, 112 S. Ct. 736 (1992), the Court noted the traditional approach to the interplay of hearsay and confrontation: "Nonetheless, we have consistently sought to 'stee[r] a middle course,' [citation], that recognizes that 'hearsay rules and the Confrontation Clause are generally designed to protect similar values,' [citation], and 'stem from the same roots,' [citation]." *White v. Illinois*, 502 U.S. 346, 352-53, 116 L. Ed. 2d 848, 857, 112 S. Ct. 736, 741 (1992).

In *Crawford*, the United States Supreme Court held that insofar as testimonial evidence is concerned, this constitutional safeguard "demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. Importantly, the confrontation clause "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford*, 541 U.S. at 61, 158 L. Ed. 2d at 199, 124 S. Ct. at 1370.

While *Crawford* distinguished testimonial and nontestimonial hearsay, the decision did not attempt to comprehensively define what constituted testimonial hearsay. Nevertheless, the Court cautioned that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford*, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. According to the Court, these were "the modern practices with closest kinship to the abuses at which the Confrontation

11

Clause was directed." *Crawford*, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374.

"Conversely, where nontestimonial hearsay is at issue, the Court held that 'it is wholly consistent

with the Framers' design to afford the States flexibility in their development of hearsay law \*\*\*

as would an approach that exempted such statements from Confrontation Clause scrutiny.' "

*People v. Leach*, 391 Ill. App. 3d 161, 169, 908 N.E.2d 120, 128 (2009), quoting *Crawford*, 541

U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. Significantly, business records and

statements in furtherance of a conspiracy, which the Court acknowledged as historically

nontestimonial, fell within that exempted class of statements. *Crawford*, 541 U.S. at 56, 158 L.

Ed. 2d at 195-96, 124 S. Ct. at 1367.

Against this background, we must determine, then, whether the reports prepared by Drs.

Choi and Snow qualify as business records. Our resolution of this question is informed by the

legislative guidepost of section 115-5.1 of the Code of Criminal Procedure of 1963, which

provides:

> "In any civil or criminal action the records of the coroner's medical or
>
> laboratory examiner summarizing and detailing the performance of his or her official
>
> duties in performing medical examinations upon deceased persons or autopsies, or
>
> both, and *kept in the ordinary course of business of the coroner's office*, duly
>
> certified by the county coroner or chief supervisory coroner's pathologist or medical
>
> examiner, shall be received as competent evidence in any court of this State, to the
>
> extent permitted by this Section. *These reports, specifically including but not limited*
>
> *to the pathologist's protocol, autopsy reports and toxicological reports, shall be*

*public documents and thereby may be admissible as prima facie evidence of the facts,*

*findings, opinions, diagnoses and conditions stated therein.*

A duly certified coroner's protocol or autopsy report, or both, complying with the requirements of this Section may be duly admitted into evidence as an exception to the hearsay rule as prima facie proof of the cause of death of the person to whom it relates. The records referred to in this Section shall be limited to the records of the results of post-mortem examinations of the findings of autopsy and toxicological laboratory examinations." (Emphasis added.) 725 ILCS 5/115-5.1 (West 2006).

The plain language of this section is persuasive and convinces us of the correctness of characterizing the reports of postmortem examinations as business records. Established precedent further galvanizes our resolve in this conclusion. See *People v. Moore*, 378 Ill. App. 3d 41, 50, 800 N.E.2d 229, 237 (2007) (autopsy report is a business record); *Fatigato v. Village of Olympia Fields*, 281 Ill. App. 3d 347, 358, 666 N.E.2d 732, 740 (1996) (toxicology report considered business record by Supreme Court Rule 236(a) (134 Ill. 2d R. 236(a))).

In *Moore*, the medical examiner who performed the autopsy retired prior to trial and was unavailable to testify. A second medical examiner testified to the contents of the report and the opinions expressed therein. The testifying medical examiner also indicated his agreement with the conclusions and opinions expressed in the report, that the victim died as a result of blunt force trauma. *Moore*, 378 Ill. App. 3d at 44, 800 N.E.2d at 232. Our second division concluded the presentation of this testimony did not deny the defendant his sixth amendment rights to confrontation. The court was persuaded that the records at issue were public records or business

records and did not implicate *Crawford* by their introduction. *Moore*, 378 Ill. App. 3d at 50-51, 800 N.E.2d at 237. The *Moore* court relied, in part, on *Fatigato v. Village of Olympia Fields*, which noted that a toxicology report was a business record by virtue of Supreme Court Rule 236(a). *Fatigato*, 281 Ill. App. 3d at 358, 666 N.E.2d at 740.

We recently arrived at a similar conclusion in *Leach*. There, the defendant was charged with the first degree murder of his wife. The autopsy in *Leach* was, like the case *sub judice*, performed by Dr. Choi, who retired prior to trial. *Leach*, 391 Ill. App. 3d at 167, 908 N.E.2d at 125-26. In reliance upon the autopsy report and materials reviewed by Dr. Choi, the testifying medical examiner opined that the victim died as a result of strangulation and her death was a homicide. *Leach*, 391 Ill. App. 3d at 167, 908 N.E.2d at 126. In rejecting defendant's confrontation clause claim, we observed, "An unbroken line of precedent instructs that business records have been uniformly regarded as an exception to the hearsay rule." *Leach*, 391 Ill. App. 3d at 169, 908 N.E.2d at 128. We likewise construed the provision of section 115-5.1 as a codification of the common law exception to hearsay for this category of business records. *Leach*, 391 Ill. App. 3d at 170-71, 908 N.E.2d at 128-29.

Furthermore, we are unpersuaded by defendant's claim that the *Melendez-Diaz* opinion "implicitly overruled" our decisions in *Leach* and *Moore*. Accord *People v. Cortez*, No. 1-07-3245 (June 22, 2010), citing *Melendez-Diaz*, 557 U.S. at ___, 174 L. Ed. 2d at 321-22, 129 S. Ct. at 2532. Importantly, *Melendez-Diaz* involved a factually inapposite situation to the one presented in the case *sub judice*. In that case, the defendant's trial included the presentation of three " 'certificates of analysis' " from forensic analysts who tested the substance found in the

1-07-2757

defendant's possession. These certificates indicated the substance tested was cocaine. *Melendez-Diaz*, 557 U.S. at ___, 174 L. Ed. 2d at 320, 129 S. Ct. at 2530-31. The Court concluded these documents fell within the " 'core class of testimonial statements' " addressed by the confrontation clause where they were "quite plainly affidavits." *Melendez-Diaz*, 557 U.S. at ___, 174 L. Ed. 2d at 321, 129 S. Ct. at 2532, quoting *Crawford*, 541 U.S. at 51, 158 L. Ed. 2d at 193, 124 S. Ct. at 1354. According to the Court:

"They are incontrovertibly a ' "solemn declaration or affirmation made for the purpose of establishing or proving some fact." ' [Citation.] The fact in question is that the substance found in the possession of [the defendant] and his codefendants was, as the prosecution claimed, cocaine – the precise testimony the analysts would be expected to provide if called at trial." *Melendez-Diaz*, 557 U.S. at ___, 174 L. Ed. 2d at 321, 129 S. Ct. at 2532.

Therefore, the preparers of the certificates were, indeed, witnesses against the defendant and thus subject to confrontation, unless they were unavailable and previously subjected to cross-examination. *Melendez-Diaz*, 557 U.S. at ___, 174 L. Ed. 2d at 321-22, 129 S. Ct. at 2532. Unlike the situation in *Melendez-Diaz*, the reports of Drs. Choi and Snow did not prove any fact in question. As noted, neither doctor came to any conclusion relative to an element of the offense charged against defendant. While it is arguable certain of Dr. Snow's estimations could provide support for certain inferences as to the identity of the decedent, he offered no opinion as to any particular fact or element of the offense charged. Characterizing Drs. Choi and Snow as witnesses against defendant would extend the rationale of *Melendez-Diaz* to a degree not

15

1-07-2757

previously contemplated.

We reached the same conclusion in *People v. Pitchford*, where the defendant made a similar challenge to the testimony of a medical examiner who did not perform the postmortem examination, but, instead, relied upon reports of another physician. *People v. Pitchford*, No. 1-07-2697 (June 1, 2010). In dispensing with the defendant's argument, our second division stated:

> "The defendant has failed to make any rational argument regarding what advantage he would have gained by cross-examining the physician who performed the autopsies and prepared the reports. The medical examiner who did testify was merely relating the results of the autopsies as written in the autopsy reports. *** An autopsy report is significantly different from a lab report of the type at issue in *Melendez-Diaz*. The inapplicability of *Melendez-Diaz* to the facts of the case is clear. The main focus of the testimony regarding the autopsy reports in this case dealt with the manner of death; specifically, establishing the fact that the victims were shot to death. At no time in the trial was the manner of death in dispute. The defendant's argument on this issue, taken to its logical conclusion, would yield absurd results. In any event, the defendant has utterly failed to show any resulting prejudice from the assistant medical examiner's testimony regarding the autopsy report." *Pitchford*, slip op. at 13-14.

An identical result obtained in *Cortez*, where our second division rejected the same argument and emphasized the position that *Melendez-Diaz* does not serve to "upset" the holdings

16

announced in *Leach* and *Moore*. *Cortez*, slip op. at 10. In *Cortez*, an autopsy report was admitted, without production of the author, over objection by the defense. *Cortez*, slip op. at 11. While acknowledging the import of the holding in *Melendez-Diaz*, the *Cortez* court noted the factual dissimilarity between the case at issue there and *Melendez-Diaz*, making *Crawford* inapplicable. *Cortez*, slip op. at 10. Instead, the court reiterated the principle reflected in prior case law, concluding that "autopsy reports are business records and do not implicate *Crawford*." *Cortez*, slip op. at 10.

Based on the conclusion that the autopsy report was a business record and in view of the relevant body of precedent, we are convinced *Crawford* is not implicated in the present case. Consequently, we conclude the introduction of the reports of Drs. Choi and Snow through the testimony of Dr. Jones was not violative of defendant's right to confront witnesses against him. See *Moore*, 378 Ill. App. 3d at 51, 800 N.E.2d at 237. Notably, the substance of Dr. Jones's testimony was directed to what could best be characterized as a summary of the reports of the other examiners.

Moreover, insofar as the substance of Dr. Choi's report is concerned, no conclusion was drawn as to the cause and manner of death of the victim, as they were "undetermined." Likewise, Snow's report was a generalized review of the skeletal remains providing estimations of age and stature. Neither of the reports went to the identity of the victim *per se*. Instead, the information contributing to the identity of the victim and the circumstances of her demise came from other sources, not the least of which was defendant's statement and revelation of the location of her remains. All of this is to say that, in a practical sense, there was little or nothing

to confront or disprove in the reports of Drs. Choi and Snow. Testimony like that presented by Dr. Jones possesses no such kinship. Moreover, we are unable to ascertain any means or measure by which Dr. Jones's testimony was harmful to defendant. Keeping in mind the jury's conclusion as against the charges against him, it is clear the jury accepted his theory of what happened. Nevertheless, there was no error and further examination of plain-error considerations is not warranted.

Next, defendant challenges the admission of other crimes evidence offered by Maria Chavez, defendant's former spouse. The evidence complained of regarded an incident wherein the defendant threatened her life, while armed with a gun. The State responds that defendant forfeited this argument because the record is insufficient for this court to consider the arguments made on the pretrial motions *in limine* and the argument does not adequately cite to the record to support his contentions. Before engaging the machinations involved in procedural default analysis, we will first determine whether an error occurred. See *Lewis*, 234 Ill. 2d at 43, 912 N.E.2d at 1227, citing *Walker*, 232 Ill. 2d at 124-25, 902 N.E.2d at 697.

As the State notes in its brief, the matter of the introduction of other crimes evidence was the subject of a motion *in limine*. The trial court's ruling permitted the State to introduce this vein of evidence. Following a cautionary instruction, the jury heard testimony from defendant's former spouse, Maria Guadalupe Chavez. According to Chavez, she and defendant divorced in April of 1999. She described their union as a "bad marriage." Then, in June, 1999, defendant visited Chavez's apartment and threatened her with a gun. Defendant pointed the gun at Chavez and told her he was going to kill her. Defendant further stated that he would hide Chavez's car in

the garage where her family would neither see the car nor find her.

Decisions concerning the admissibility of evidence are left solely to the trial court acting in its discretion. *People v. Harris*, 231 Ill. 2d 582, 588, 901 N.E.2d 367, 370 (2008). As a reviewing court, we will not reverse an such evidentiary determinations unless there record "clearly demonstrates" discretion was abused. *Harris*, 231 Ill. 2d at 588, 901 N.E.2d at 370.

Manifestly, evidence of other crimes committed by a defendant is not admissible if its relevancy is limited merely to establishing a propensity to commit crime. *People v. Kliner*, 185 Ill. 2d 81, 146, 705 N.E.2d 850, 883 (1998). Nevertheless, admission of such evidence may be permitted "where relevant to prove any material question other than the defendant's propensity to commit crime, including *modus operandi*, intent, identity, motive, or absence of mistake." *Kliner*, 185 Ill. 2d at 146, 705 N.E.2d at 883. In considering admission, it is incumbent upon the trial judge to weigh the probative value of the proposed evidence as against the danger of prejudice to the defendant. *People v. Illgen*, 145 Ill. 2d 353, 365, 583 N.E.2d 515, 519 (1991). We review this claim of error under the abuse of discretion standard. *Kliner*, 185 Ill. 2d at 146, 705 N.E.2d at 883.

Our review of the evidence presented at trial gives credence to the relevance of this evidence. The similarity between defendant's confession and the threat made to his ex-wife is unmistakable. That the prior threat involved a gun does not alter our perception. Importantly, the similarity in the two accounts is not indicative of propensity evidence. Instead, it could comfortably fit within the context of intent, *modus operandi*, or absence of mistake. See *Kliner*, 185 Ill. 2d at 146, 705 N.E.2d at 883. Among these, the concept of *modus operandi* strikes a

19

1-07-2757

particularly resonant chord. As our second division discussed in *People v. Jackson*, when evaluating a jury instruction:

> "Defendant's instruction defined *modus operandi* as 'a pattern of behavior so distinct
>
> that separate acts or conduct are recognized as the work of the same person.' We
>
> note that *modus operandi* is generally defined in this fashion in Illinois cases."
>
> *People v. Jackson*, 331 Ill. App. 3d 279, 291-92, 771 N.E.2d 982, 993 (2002).

This definition provides a sound basis for the admissibility of this evidence.

Chavez's testimony, coupled with defendant's admission that he got angry with Elvia and responded by pushing her, illustrates his manner of handling stressful or upsetting situations. Likewise, this evidence could capably demonstrate an absence of mistake on his part. Given the jury's verdict, the use of this evidence to demonstrate intent is less clear. Nevertheless, given the various alternate uses for this evidence, other than to establish propensity, we cannot conclude the trial court abused its discretion by admitting Chavez's testimony.

As we conclude there was no abuse of discretion, defendant's claim of error is without merit. We, therefore, need not consider whether the plain-error doctrine would permit defendant to overcome the procedural default of his claim.

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

FITZGERALD SMITH and HOWSE, JJ., concur.

20

1-07-2757

| Please Use Following Form: | |
| --- | --- |
| Complete TITLE of Case | THE PEOPLE OF THE STATE OF ILLINOIS,<br><br>Plaintiff-Appellee,<br><br>v.<br><br>ARMANDO ANTONIO,<br><br>Defendant-Appellant. |
| Docket No.<br><br>COURT<br><br>Opinion Filed | No. 1-07-2757<br>Appellate Court of Illinois<br>First District, FIFTH Division<br><br>August 30, 2010<br>(Give month, day and year) |
| JUSTICES | PRESIDING JUSTICE TOOMIN delivered the opinion of the court:<br><br>FITZGERALD SMITH and HOWSE, JJ.      concur [s]<br><br>dissent[s] |
| APPEAL from the Circuit Ct. of Cook County, Chancery Div. | Lower Court and Trial Judge(s) in form indicated in the margin:<br><br>The Honorable    Dennis Dernbach,   Judge Presiding. |
| For APPELLANTS, John Doe, of Chicago.<br><br>For APPELLEES, Smith and Smith of Chicago, Joseph Brown, (of Counsel)<br><br>Also add attorneys for third-party appellants or appellees. | Indicate if attorney represents APPELLANTS or APPELLEES and include attorneys of counsel. Indicate the word NONE if not represented.<br><br>Attorneys for Plaintiff-Appellee-People of the State of Illinois:   Anita Alvarez<br>State's Attorney<br>County of Cook<br>Room 309-Richard J. Daley Center,<br>Chicago, IL 60602<br><br>Of counsel: Alan Spellberg, Mary Boland<br><br>Attorneys for Defendant-Appellant-Armando Antonio:    Abishi C. Cunningham, Jr.<br>Gwyndolette Brown<br>69 West Washington, 15th floor<br>Chicago, IL 60602 |